### HERCULES MINING CO. v. UNITED STATES.

#### No. 1438.

District Court, D. Idaho, N. D.

June 29, 1940.

J. H. Wourms and Paul B. Jessup, both of Wallace, Idaho, for plaintiff.

John A. Carver, U. S. Dist. Atty., and E. H. Casterlin and Paul S. Boyd, Asst. U. S. Dist. Attys., all of Boise, Idaho, for defendant.

CAVANAH, District Judge.

The action presents the same principle of law that appeared in the cases of United Mercury Mines Co. v. Viley, Collector of Internal Revenue, D.C., 20 F. Supp. 734, and Ambergris Consolidated Mining Company v. United States, D.C., 27 F.Supp. 968, where the Court was called upon to interpret the revenue Act known as the Capital Stock Tax Act, 26 U.S.C.A. Int.Rev.Code, § 1200 et seq., and it was there held that the activities engaged in by the Company depended upon its particular facts and must relate to the carrying on in a corporate capacity as authorized. This principle is recognized by the Supreme Court in the case of Von Baumbach v. Sargent Land Co., 242 U.S. 503, 37 S.Ct. 201, 61 L.Ed. 460.

So the inquiry here is whether or not the activities engaged in by the plaintiff mining company during the years ending June 30, 1934 and 1935, constituted carrying on or engaging in business within the scope of the Act.

The material facts are not disputed as it appears that the plaintiff, a Delaware corporation, qualified as a foreign corporation under the laws of Idaho, was organized primarily for the purpose of engaging in the mining business and acquired a group of mining claims in Shoshone County, Idaho.

To determine as to what activities it engaged in during the taxable years ending June 30, 1934 and 1935, it becomes necessary under the evidence to also consider what the situation was when the plaintiff took over the mining properties as a corporation when it was organized in December, 1923. Prior to the time of its organization, its predecessor in interest, Hercules Mining Company, a mining partnership, carried on extensive mining operations and reduced large quantities of ore so mined at its mill or concentrators located at Wallace, Idaho. In April, 1925, its ore body became exhausted, and while its mining operations were terminated it continued expending money and time in carrying on development and expansion work in an effort to locate a possible extension of its ore bodies but that seemed to prove unsuccessful and was discontinued prior to 1933. After it terminated its mining operations it utilized its concentrating and milling facilities by operating a custom mill for the treatment of ore from other mining properties in the vicinity which were without milling facilities. About the month of September, 1932, the custom milling operations were discontinued due to the decline in base metal prices during the period of the depression, which resulted in the shutting down of the mines which had been supplying ore for plaintiff's mill, and that situation continued until the latter part of 1935, when the mining facilities of the plaintiff were leased to the Sullivan Mining Company which operated the mill until the fall of 1936, and since May, 1937, the plaintiff resumed its custom milling operation. During the discontinuance of active mining and milling operation during the years 1934 and 1935 the plaintiff was still the owner of large underground workings and mill machinery and equipment located underground and at its surface plant, certain mine dwellings and a community hall and the maintenance of these properties required it to expend approximately $37,621.52 during 1934, and approximately $32,750.54 during 1935. During that period its surplus funds had been invested in certificates of deposit in banks and the interest thereon had to be collected and its proceeds reinvested, also it

had investments in the capital stock of other inactive mining companies. The attention to be given to these matters required an office force to keep the corporate records and management. It seems that during that period certain of its officers served without compensation. Its total depreciation, office, legal and general expense for the year ending June 30, 1934, was $53,743.54, and the same expense for the taxable year of 1935 was $46,608.48. Its gross revenue during the two taxable years was $31,482.81 for 1934, of which $27,932.24 was from interest, and $28,903.-14 for the year 1935, of which $25,523.17 was interest.

Plaintiff had certain inactive subsidiaries, which were carried on by its employees, who were charged for the service at cost and no profit was made by it. At times non-interest bearing loans and advances were made to the subsidiaries who were without funds and unable to defray their expenses which had been incurred in connection with the maintenance of their corporate existence. The loans were not made for the purpose of profit and none were realized.

During the year ending June 30, 1934, plaintiff collected $111.76 in royalties from the sale of ore from former or part time employees who had been granted the privilege of gathering together ore from the old mine workings. There was one carload of such ore shipped by two persons, and it does not appear whether it was removed prior or subsequent to July 1, 1933, and was sold subsequent to that date. There was another carload of ore shipped and no royalties received by the plaintiff as it was from the Ambergris Consolidated Mining Company, and was removed prior to July 1, 1933, and had been stored awaiting better prices. Another carload of ore was removed from plaintiff's property and royalties of $94.12 received.

In September, 1932, when plaintiff closed down its custom mill, it had large quantities of fuel oil on hand and it being desirous of getting rid of it sold it at cost to the employees and others who paid the transportation expenses from its storage tanks. After that supply was exhausted it made further purchases and likewise so sold it at cost but that was soon discontinued. The practice of buying and selling fuel oil existed to some extent during the fall of 1933. There were two antecedent obligations of plaintiff's as the final pay-

ment to a consulting geologist for services rendered in connection with examination of plaintiff's property prior to 1930, and the payment in 1935 of $393.37 on final account for the purchase of stocks of other corporations for the plaintiffs for the years 1928 and 1929. During the year ending June 30, 1935, plaintiff reimbursed its president in the sum of $534.99 for expenditures made by him in connection with an examination of mining property in California. It seems this work was carried on by the president in his individual capacity as it was not authorized by the plaintiff. The only sale of its securities during the two taxable years was $23,000 par value of Liberty bonds at a profit of $222.81.

While there passed through the plaintiff during these two years large sums, yet the maintenance and watching of its surface plants, dwellings and underground workings required the expenditure of large sums of money, exclusive of depreciation, legal, office and general expenses allocated thereto, it expended $37,621.52, which consisted of insurance, taxes, maintenance, fire and water protection, light and power, employees' compensation property examination and mining timbers, and during the year ending June 30, 1935, approximately $32,750.54. It seems that its large surplus and working capital funds had mostly been invested in time certificates of deposit and bonds, which required attention and the interest thereon had to be collected and the proceeds had to be reinvested. It had also large investments in the capital stock of other inactive mining companies which it had acquired prior to the two taxable years in connection with its operation. These and the attention required to be given to its other property necessitated the retention of an office force to keep the corporation records and perform other services in the preservation of its property.

The few non-continuing transactions such as the collection of $111.76 royalties, the sale of the leased ore, the sale of large quantities of fuel oil at cost, the final payment on the consulting geologist account formerly entered into, the payment of one of its directors of the sum of $393.37 on the final account made for the purchase of stock of other corporations for the plaintiff in 1928 and 1929, the payment of $534.99 to its president to reimburse him for expenditures made in connection with the examination of mining

106

property in California, and the receiving of $222.81 on the sale of Liberty bonds above par, are not considered by the authorities as acts constituting carrying or doing business under the Act. Rose, Collector of Internal Revenue v. Nunnally Inv. Co., 5 Cir., 22 F.2d 102; United Mercury Mines Co. v. Viley, Collector of Internal Revenue, supra; Ambergris Consolidated Mining Co. v. United States, supra.

These inactive subsidiaries of the plaintiff were not required to pay capital stock tax during the two taxable years.

The test is to be deemed from all of the evidence as to what constitutes carrying on or doing business, is defined to be, by article 32 of the regulations of the Commissioner of Revenue as: "Art. 32. Application of the tax—The words 'carrying on or doing business' must be given their ordinary and natural significance. 'Business' is a very comprehensive term and embraces whatever occupies the time, attention, or labor of men for the purpose of livelihood or profit. In other words, business necessarily involves the idea of the pursuit of gain. If a corporation was organized for profit and is doing what it was principally organized to do in order to realize profit, it is doing business * * *". And the mere acts that may be necessary for the maintenance of the company's property status and holding specific property, collecting and distributing of the avails of property and reinvesting its funds are the exceptions of doing business, and this principle is recognized by the Supreme Court in the case of Von Baumbach v. Sargent Land Co., supra, where the Court said at page 516 of 242 U.S., at page 204 of 37 S.Ct., 61 L.Ed. 460: "It is evident, from what this court has said in dealing with the former cases, that the decision in each instance must depend upon the particular facts before the court. The fair test to be derived from a consideration of all of them is between a corporation which has reduced its activities to the owning and holding of property and the distribution of its avails, and doing only the acts necessary to continue that status, and one which is still active and is maintaining its organization for the purpose of continued efforts in the pursuit of profit and gain, and such activities as are essential to those purposes." United Mercury Mines Co. v. Viley, Collector of Internal Revenue, supra; Ambergris Consolidated Mining Co. v. United States, supra; McCoach, Collector of Internal Revenue v. Minehill & Schuylkill Haven Railroad Company, 228 U.S. 295, 33 S.Ct. 419, 57 L.Ed. 842; United States v. Emery, Bird, Thayer Realty Company, 237 U.S. 28, 35 S.Ct. 499, 59 L.Ed. 825; Lewellyn, Internal Revenue Collector v. Pittsburgh, B. & L. E. R. Co., 3 Cir., 222 F. 177.

So it is evident that under all of the facts disclosed by the record that it fails to show that the plaintiff was "carrying on or engaged in business", during the taxable years in question or pursuing its primary purpose of mining or engaged in any activity other than the maintenance of its corporate existence or its ownership of property, within the meaning of the Act.

Therefore, the amount of taxes under consideration were unlawfully imposed upon the plaintiff, who is entitled to judgment as prayed for in its complaint.