## GENERAL RIBBON MILLS, Inc., v. HIGGINS, Collector of Internal Revenue.

### No. 35.

Circuit Court of Appeals, Second Circuit.

Nov. 12, 1940.

Dolores C. Faconti, Asst. U. S. Atty., of New York City (John T. Cahill, U. S. Atty., of New York City, on the brief), for appellant.

Arthur J. Brothers, of New York City (Epstein & Brothers, of New York City, and Robert A. Levitt, of Brooklyn, on the brief), for appellee.

Before SWAN, CHASE, and CLARK, Circuit Judges.

CLARK, Circuit Judge.

By Section 105(a) of the Revenue Act of 1935, as amended by Section 401(a) of the Revenue Act of 1936, 26 U.S.C.A. Int.Rev. Acts, page 798, there was "imposed upon every domestic corporation with respect to carrying on or doing business for any part of such year" an excise tax measured by the value of its capital stock. The sole question presented is whether or not plaintiff was "carrying on or doing business" before the close of the taxable year, June 30, 1937, within the meaning of the Act.

Plaintiff was originally organized May 13, 1937, at a meeting of the incorporators, at which by-laws were adopted, directors elected, and a resolution passed authorizing the issuance of capital stock. Immediately thereafter occurred a meeting of the directors, at which a corporate seal, a form of stock certificate, a stock transfer book, and stock ledger were adopted, the location of a principal office was approved, and officers were elected and authorized to act generally on behalf of the corporation. Certain individuals, three of whom were the plaintiff's newly elected officers, then presented to the meeting an offer to transfer 80 per cent of the common stock of General Ribbon Mills, Inc. (Pa.), in exchange for stock in General Ribbon Mills, Inc. (Del.), the plaintiff; and the offer was immediately accepted. The meeting then adjourned for a short time, and the exchange was made. Upon reconvening, the directors adopted resolutions by which it was "recommended" that the Pennsylvania corporation be dissolved and its assets distributed to stockholders, $333.33 a share to be paid to those other than plaintiff; and plaintiff's officers were authorized to vote the stock of the Pennsylvania corporation in order to carry out such recommendations.

Nothing further was done at this meeting, nor after it, until August 31, 1937, when plaintiff took over the properties of the Pennsylvania corporation and began to operate its business. Therefore, the contention that plaintiff was "carrying on or doing business" before July 1, 1937, must be based entirely on the acts recited above, and principally on the transfer of stock and the adoption of the resolutions authorizing the steps necessary to acquisition of the Pennsylvania corporation's business.

A corporation "organized for profit" is said to be "doing business" when it is "carrying out the purpose of its organization," or "buying, selling, manufacturing, developing, financing, speculating or otherwise dealing in property of any description"; but not on a mere "issuance and sale of its stock for cash." U.S.Treas.Reg. 64, 1936 Ed., Arts. 42-43.

It is true that one of the purposes stated in plaintiff's articles of incorporation was "to acquire by purchase, subscription or otherwise * * * stocks * * * of any corporation." But this appears as only one minor detail of a very broad and general definition of corporate purposes; and it is evident, as the stipulated facts show,

that from the first the real objective of the corporation was to take over and operate the Pennsylvania corporation's business of manufacturing and selling ribbons. The stock here was acquired not to be dealt or speculated in, but as a step in obtaining the business which the company eventually intended to operate. The reasonable construction to be given to the steps taken May 13, 1937, is that they were incidental to the organization of the plaintiff, and preparatory to "carrying out the purpose of its organization," but not a "carrying out" itself within the meaning of the Act and the Regulations. This distinction was recognized in Nicholas v. Colorado Fuel & Iron Corp., 10 Cir., 112 F.2d 858.

■ Obviously the distinction between what is and what is not "doing business" becomes refined, indeed, in particular instances. Hence each case in which that distinction is to be made must be decided "on its own facts." Von Baumbach v. Sargent Land Co., 242 U.S. 503, 37 S.Ct. 201, 61 L.Ed. 460. This one presents facts not entirely unequivocal; nevertheless the precedent of similar cases, we think, points to a conclusion that tax liability was not incurred. And as suggested, reason accords with that conclusion.

■ The issuance of stock for the stock of another corporation is not in itself "doing business," being an act consistent with the nature of a "dry" holding company, and not necessarily more active or venturesome than an issuance of stock for cash, which U.S.Treas.Reg. 64, 1936 Ed., Art. 43(b) (1), accepts as not "doing business." United States v. Three Forks Coal Co., 3 Cir., 13 F.2d 631; Eaton v. Phoenix Securities Co., 2 Cir., 22 F.2d 497; Mason v. United States, D.C.Mass., 27 F.2d 1013; and Mode O'Day Corp. v. Rogan, D.C.S.D. Cal., 32 F.Supp. 571, are cases in which there was acquisition by the taxpayer of stock in other corporations. In both the Three Forks Coal and Mason cases, the ultimate purpose of the taxpayer was not the holding of securities, but active operation of properties to be acquired, and in the Three Forks Coal and Phoenix Securities cases, there were numerous acquisitions within the taxable period; yet in none of them was the taxpayer held to be "doing business."

■ The exception to "doing business" of an "issuance and sale of its stock for cash," of the Treasury Regulation cited, carries no negative implication that an issuance for property necessarily is "doing business"; for the exceptions are expressly said to be "ordinarily * * * restricted to limited activities of a corporation, such as" a sale for cash, thus indicating that to be a mere example. The possibility of reading into the Regulation any such negative implication has been repudiated by the cases just cited.

Nor does Art. 43(A) declare the "making of contracts" itself to be "doing business," except when "in addition to" the issuance of stock. Obviously, this provision contemplated approximately the situation of Associated Furniture Corp. v. United States, Ct.Cl., 44 F.2d 78, where stock was issued and then contracts of employment were made, thus showing that the corporation was beginning to "carry on" the business. Here, the only contract made during the taxable year was that under which the stock was issued, not "in addition to" the issuance of the stock.

The adoption of the subsequent resolutions, as is pointed out by Judge Leibell in his thoughtful opinion below, 32 F.Supp. 534, 537, was an "outline of a plan" or an "expression of what the taxpayer corporation would like to do," not a contract or commitment of any sort. It had not even advanced to the stage of any overt step taken by agents of the corporation to carry the plan into effect. Whether or not it is material that the plan might have been frustrated or abandoned, it certainly is material that no corporate power was yet exercised in its execution. Again there are cases in which more than was done here fell short of constituting "doing business" under the Act. Of the cases cited above, see particularly the Three Forks Coal, the Mason, the Mode O'Day Corporation, and the Colorado Fuel & Iron Corporation cases; and see also Rose v. Nunnally Inv. Co., 5 Cir., 22 F.2d 102, and Hercules Mining Co. v. United States, D.C.Idaho, 34 F. Supp. 103. In the Nunnally Inv. Co. case, salaries were paid to officers of the company, and loans were made for the accommodation of employees of a subsidiary. The Colorado Fuel & Iron Corporation case presents facts almost identical with those in the case at bar, except that resolutions prior to July 1 there provided in some detail for the management of the business to be acquired, and that some few items of office equipment were actually purchased. The fact that there the new cor-

poration was a successor corporation under section 77B, Bankr.Act, 11 U.S.C.A. § 207, reorganization seems to be irrelevant to the present issue.

On the other hand, those somewhat similar cases in which liability was imposed show definite exercise of corporate powers, not mere resolutions by which such activity is authorized. In Harmar Coal Co. v. Heiner, 3 Cir., 34 F.2d 725, the taxpayer held coal lands for profit and owned and voted stock in another corporation, which it controlled. In Associated Furniture Corp. v. United States, supra, the taxpayer not only acquired the stock of other corporations and passed several resolutions preparatory to the carrying on of its subsidiaries' businesses (which would have duplicated the situation here), but its officers proceeded during the taxable period to enter into contracts of employment with managers and assistant managers for each of its subsidiaries. In Argonaut Consolidated Mining Co. v. Anderson, 2 Cir., 52 F. 2d 55, the taxpayer was constantly engaged in speculative activities. Von Baumbach v. Sargent Land Co., supra; Edwards v. Chile Copper Co., 270 U.S. 452, 46 S.Ct. 345, 70 L.Ed. 678; New Haven Securities Co. v. Bitgood, 2 Cir., 87 F.2d 759; and United States v. Peabody Co., 6 Cir., 104 F.2d 267, exhibit the same kind of, but more far-reaching, activity.

Judgment affirmed.